Dean G. Rallis Jr. (# 94266)
  drallis@afrct.com
Matthew D. Pham (# 287704)
  mpham@afrct.com
ANGLIN, FLEWELLING, RASMUSSEN,
CAMPBELL & TRYTTEN LLP
301 N. Lake Ave, Suite 1100
Pasadena, CA  91101-4158
Tel: (626) 535-1900 | Fax: (626) 577-7764

Proposed Attorneys for Howard and Anna Foster

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>FOSTER ENTERPRISES, a California general partnership,<br><br>    Debtor.<br><br>In re<br><br>HOWARD DEAN FOSTER and ANNA MAE FOSTER,<br><br>    Debtors.<br><br>☐ Affects All Debtors<br><br>☐ Affects FOSTER ENTERPRISES, a California general partnership<br><br>☒ Affects HOWARD DEAN FOSTER and ANNA MAE FOSTER | Lead Case No.: 6:17-bk-15749-SC<br><br>Chapter 11<br><br>Jointly Administered with:<br><br>Case No.: 6:17-bk-15915-SC<br><br>**HOWARD AND ANNA FOSTER'S MOTION FOR ORDER AUTHORIZING SALE OF ESTATE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS; EMPLOYMENT OF RE/MAX REALTY 100 AS REAL ESTATE BROKER; AND PAYMENT OF LIENS, COSTS, COMMISSION, AND HOMESTEAD EXEMPTION RELATED TO SALE**<br><br>*[Real Property Located at 20262 Dameral Drive, Covina, California 91724]*<br><br>Date:  TBD<br>Time:  TBD<br>Place:  411 West Fourth Street<br>        Courtroom 5C<br>        Santa Ana, California 92701<br><br>Alternative Location<br>3420 Twelfth Street<br>Video Hearing Room 126<br>Riverside, California 92501 |

/ / /

Howard and Anna Foster (the "Foster Individuals"), the debtors and debtors in possession in one of the above-captioned chapter 11 cases, hereby move for an order authorizing the sale of certain real property located at 20262 Dameral Drive, Covina, California 91724 (the "Property") free and clear of liens, claims, and interests; employment of RE/MAX Realty 100 as the Foster Individuals' real estate broker; and payment of liens, costs, a commission, and a homestead exemption related to the sale of the Property (the "Motion"), pursuant to §§ 327, 328, 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014, 2016, 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1, 2016-1, 6004-1 of the Local Bankruptcy Rules (the "Local Rules" or "L.B.R.s"). The Motion is supported by the concurrently filed declarations of Howard D. Foster (the "Foster Declaration") and Jenny Xu (the "Xu Declaration") and request for judicial notice (the "RJN").

## 1. SUMMARY OF PROPOSED SALE, EMPLOYMENT, AND COMMISSION

- Property to Be Sold: Real property located at 20262 Dameral Drive, Covina, California 91724 (APN: 8277-021-013)

- Proposed Buyer: Simon Pei En Chu and Min Li, as trustees of the Simon Chu & Min Li Living Trust dated March 31, 2007 (the "Buyer")

- Proposed Purchase Price: $1,090,000.00

- Other Material Terms of Purchase Agreement: All cash; no buyer contingencies; the Property to be sold in "as is" condition; $3,500.00 credit to the Buyer for costs relating to termite repairs, fumigation, and septic tank inspection and certification

- Proposed Broker: RE/MAX Realty 100 (Jenny Xu as agent thereof)

- Proposed Broker Commission: $54,500.00 to RE/MAX Realty 100 (as dual agent for both the Foster Individuals and the Buyer)

- Type of § 363 Sale: Private sale, not subject to higher and better bids

- Free-and-Clear Relief: Sale is proposed to be free and clear of all alleged or asserted liens, claims, and interests in the Property held by the Internal Revenue Service

///

///

## 2. RELIEF REQUESTED

By this Motion, the Foster Individuals seek an order (1) authorizing the Foster Individuals to (a) sell the Property to the Buyer on substantially the same terms as the parties' purchase agreement by private sale not subject to higher and better bids; (b) take any and all necessary actions to consummate the sale of the Property, including negotiating and making any non-material modifications to the parties' purchase agreement; (c) employ RE/MAX Realty 100 as their real estate broker; (d) pay the applicable liens and costs of sale; (e) pay a commission to RE/MAX Realty 100 in the amount of $54,500.00; and (f) deposit an amount not to exceed $175,000.00 from the remaining sale proceeds in a new, segregated bank account on account of the Foster Individuals' claimed homestead exemption; (2) authorizing the sale of the Property free and clear of any alleged or asserted liens, claims, and interests held by the Internal Revenue Service; and (3) waiving the 14-day stay under Bankruptcy Rule 6004(h).

## 3. FACTUAL AND PROCEDURAL BACKGROUND

### A. Background of the Foster Individuals.

The Foster Individuals filed a voluntary petition under chapter 11 of the Bankruptcy Code on July 10, 2017. On said date, Foster Enterprises, a California general partnership ("Foster Enterprises"), also filed a voluntary petition under chapter 11, and both chapter 11 cases have since been ordered to be jointly administered under Foster Enterprises' case. The Foster Individuals continue to operate their business and manage their property as the debtors in possession under §§ 1107 and 1108 of the Bankruptcy.

Among the assets of the Foster Individuals' bankruptcy estate is certain real property located at 20262 Dameral Drive, Covina, California 91724. See Foster Decl. ¶ 3. The Foster Individuals originally purchased the Property in 1997 and have continuously used and occupied the Property as their principal residence since then. See id. In their chapter 11 case, the Foster Individuals have claimed a $175,000 homestead exemption in the Property. See Sch. C, at 1, ECF No. 62.

### B. The Foster Individuals' Prepetition Efforts to Sell the Property.

In early June 2017, the Foster Individuals decided that they would sell the Property and

then purchase and move into a smaller, more reasonably priced residence. Foster Decl. ¶ 4. They enlisted the help of one of their sons, Stanley Foster ("Stanley"), to move that process forward, including assisting them with engaging a broker to market and sell the Property. Id. Stanley put them in touch with two potential brokers. Id. ¶ 5. The first was the Monica Diaz Team, consisting of agents Monica Diaz and Jay Campbell (the "Diaz Team"), affiliated with the brokerage firm Keller Williams Covina. Id. The second was agent Jenny Xu of the brokerage firm RE/MAX Realty 100. Id.

The Foster Individuals interviewed both the Diaz Team and Ms. Xu, communicating to them that they believed the Property to be worth more than $1,200,000. Id. ¶ 6. In response, the Diaz Team showed them recent comparable properties and indicated that it was unlikely that the Property could be sold for over $1,000,000 given that it did not have the amenities that other properties in the area selling for over that price had, such as a view, a pool, or a tennis court. Id. ¶ 7. The Diaz Team then recommended a listing price between $948,800 and $988,800, noting that the higher figure was, in their opinion, a "stretch." Id. In contrast, Ms. Xu proposed listing the Property at the higher price of $1,189,000 to gauge prospective buyers' interest in the Property, but she acknowledged that comparable properties supported a purchase price under $1,000,000. Id. ¶ 8. After hearing what the potential brokers had to say, the Foster Individuals decided to engage RE/MAX Realty 100 as their broker, with Ms. Xu as the listing agent. Id.

On June 22, 2017, the Foster Individuals and the Broker entered into a listing agreement, providing the Broker with the exclusive right to market and sell the Property over the next six months at the proposed listing price of $1,189,000 (the "Listing Agreement"). See id. ¶ 9 & Ex. 1, at 9. Under the terms of the Listing Agreement, the Foster Individuals agreed to pay 5.5% of the purchase price of the Property in broker commissions, with a 2.5% commission to the Broker for representing them as the seller's agent and a 3.0% commission to a third-party broker for representing the buyer as its agent. See id. ¶ 9 & Ex. 1, at 12. However, if the Broker represented both the Foster Individuals and the buyer in the sale, the Foster Individuals agreed that the Broker would be entitled to a 5.0% commission. See id. A true and correct copy of the Listing Agreement is attached as **Exhibit 1** to the Foster Declaration.

On June 27, 2017, the Broker listed the Property on the California Regional Multiple Listing Service (the "CRMLS") at the $1,189,000 listing price (the "Listing"). See Xu Decl. ¶ 7. Eight days passed without the Broker receiving any communications from anyone expressing any interest in or making an offer on the Property. See id. ¶ 8. However, on July 5, the Broker was able to locate a prospective buyer, Simon Pei En Chu and Min Li, as trustees of the Simon Chu & Min Li Living Trust dated March 31, 2007, who made an all-cash offer to purchase the Property for $1,050,000. See id. ¶ 9. The next day, the Foster Individuals made a counteroffer for $1,130,000. See Foster Decl. ¶ 11. On July 11 (i.e., one day after the petition date), the Buyer made a counteroffer for $1,090,000, see Xu Decl. ¶ 13, which the Foster Individuals accepted the following day,[1] see Foster Decl. ¶ 17. In connection with the offer and counteroffers between the Foster Individuals and the Buyers, the Broker, after making the appropriate disclosures and obtaining the parties' consent, acted as a dual agent, representing both the Foster Individuals as the seller's agent and the Buyer as the buyer's agent in the sale. See Xu Decl. ¶ 15 & Ex. 1.

**C.    The Purchase Agreement.**

The purchase agreement between the Foster Individuals and the Buyer consists of the following executed documents (collectively, the "Purchase Agreement"): (1) the *Residential Purchase Agreement and Joint Escrow Instructions* dated July 4, 2017, (2) the *Seller Counter Offer No. 1* dated July 5, 2017, (3) the *Buyer Counter Offer No. 1* dated July 11, 2017, (4) the *Addendum No. 1* dated July 23, 2017, and (5) the *Contingency Removal No. 1* dated July 23, 2017. See Foster Decl. ¶ 19. A true and correct copy of the Purchase Agreement is attached to the Foster Declaration as **Exhibit 2**.

Under the terms of the Purchase Agreement, the Buyer has agreed to purchase the Property for $1,090,000 (the "Purchase Price"), with no buyer contingencies and accepting the Property to be sold "as is" in its present condition. See id. ¶ 20 & Ex. 2, at 25–27. The Buyer still intends to purchase the Property with all cash and have provided the Foster Individuals with

---

[1] In the joint-administration motion, the Foster Individuals incorrectly stated that they had accepted the Buyer's counteroffer prior to the filing of their chapter 11 petition. An explanation for this misstatement is provided in the Foster Declaration.

proof of its ability to do so. Id. ¶ 20. The Buyer has also agreed to rent the Property back to the Foster Individuals for 45 days, free of charge, following the close of escrow. See id. ¶ 20 & Ex. 2, at 25. The Foster Individuals have agreed to credit $3,500 to the Buyer at the close of escrow for all costs relating to termite repairs, fumigation, and septic tank inspection and certification (the "Buyer Credit"). See id. ¶ 20 & Ex. 2, at 26.

Escrow for the sale of the Property has since opened and is currently set to close no later than August 11, 2017. Id. ¶ 21. However, the Foster Individuals anticipate that the Buyer will be agreeable to a request to extend the closing date if they propose reducing their rent-back period by the same number of days as any extension (such that any move-out date is no later than September 25). Id.

**D.    Liens, Broker Commission, Costs of Sale, and Homestead Exemption.**

   **i.    Liens Against the Property.**

The Foster Individuals have received a preliminary title report for the Property, dated June 28, 2017 (the "Title Report"). Foster Decl. ¶ 22. A true and correct copy of the Title Report is attached as **Exhibit 3** to the Foster Declaration.

The Title Report indicates that the Property is encumbered by a deed of trust in favor of the assignee-beneficiary U.S. Bank N.A., as successor trustee for Morgan Stanley Mortgage Loan Trust 2006-17XS, securing an indebtedness originally owed to the lender SBMC Mortgage. See id. ¶ 23 & Ex. 3, at 32. Such indebtedness represents the Foster Individuals' home mortgage loan, for which they have been making payments to the current servicer Specialized Loan Servicing and for which the current outstanding balance is approximately **$806,332.25** (the "Mortgage Lien"). See id. ¶ 23. Other than potential liens for annual and supplemental property taxes, which the Foster Individuals estimate will not exceed **$2,770** (the "Property Tax Liens"), the Title Report does not list any other liens against the Property. See id. ¶ 24 & Ex. 3, at 30.

The Foster Individuals request that they be permitted to pay the amounts owed on account of the Mortgage Lien and Property Tax Liens (together, the "Liens") directly out of escrow upon the close of the sale without further order of the Court.

///

### ii. **No Liens Recorded by the IRS.**

Notwithstanding the Title Report, it possible that the Internal Revenue Service (the "IRS") may assert a federal tax lien against the Property owned by the Foster Individuals for unpaid taxes purportedly owed to the IRS by Foster Enterprises as a result of Anna Foster being a general partner of Foster Enterprises.

In its proof of claim filed in the Foster Enterprises' case (the "IRS Claim"), the IRS identified various taxes owed by Foster Enterprises, along with the notices of federal tax lien associated with those taxes (the "Tax Lien Notices") and where and when such notices were recorded or filed. See IRS's Proof of Claim No. 3, Attach. 1, Case No. 6:17-bk-15749-SC. For certain of those taxes, the associated recorded Tax Lien Notices have identified the taxpayer as "FOSTER ENTERPRISES, a Partnership" and "ANNA MAE FOSTER, GEN PTR," see RJN Ex. 1, suggesting that the IRS may be asserting a lien against real property in the applicable county owned not only by Foster Enterprises but also Anna Foster.

However, for the two Tax Lien Notices identified in the IRS Claim that were recorded in Los Angeles County—the county in which the Property is situated—the IRS has only identified the taxpayer as "FOSTER ENTERPRISES, A PARTNERSHIP, a Partnership" in the notices, see RJN Exs. 2 & 3, which suggests that the IRS is not intending to claim a lien against real property in Los Angeles County owned by anyone other than potentially Foster Enterprises. Since the Foster Individuals dispute the perfection of any lien against the Property from the IRS recording the Tax Lien Notices, the Foster Individuals request that the sale of the Property be free and clear of any and all liens, claims, and interests held by the IRS.[2]

### iii. **Broker Commission.**

Under the Listing Agreement, the Foster Individuals agreed to pay the Broker a commission equal 5.0% of the purchase price if the Broker "represents both Seller [the Foster

---

[2] The Foster Individuals have also identified two other Tax Lien Notices recorded in Los Angeles County that were not identified in the IRS Claim. See RJN Exs. 4 & 5. However, it is unclear whether all Tax Lien Notices recorded by the IRS in Los Angeles County on account of taxes owed by Foster Enterprises or the Foster Individuals have been identified. Nevertheless, the free-and-clear relief requested in this Motion is intended to encompass all of the IRS's liens, claims, and interests in the Property.

Individuals] and Buyer" and "procures a ready, willing, and able buyer(s) whose offer to purchase the Property on any price and terms is accepted by Seller, provided the Buyer completes the transaction or is prevented from doing so by Seller." See Foster Decl. ¶ 9 & Ex. 1, at 9, 12. Assuming that the sale closes, the conditions for the Broker to receive its commission will be met, and based on the Purchase Price of $1,090,000, a 5.0% commission will equal $54,500.00 (the "Commission").

The Foster Individuals request that they be permitted to pay the Commission to the Broker, RE/MAX Realty 100, directly out of escrow upon the close of the sale without further order of the Court.

### iv. Costs of Sale.

In addition to the Commission, the Foster Individuals will also have other costs relating to the sale, including, but not limited to, a natural hazard zone disclosure report, smoke alarm and carbon monoxide device installation and water heater bracing (if required by law), escrow fees, owner's title insurance policy, county transfer taxes or fees, city transfer taxes or fees, a one-year home warranty plan (not to exceed $850.00), plus any other fees, charges, or costs related to or concerning the transfer of the Property or described in the Purchase Agreement (collectively, the "Costs of Sale"). See Foster Decl. ¶ 25 & Ex. 2, at 15–16. For purposes of calculating the remaining sale proceeds and the estate's tax liability, the Foster Individuals has estimated the Costs of Sale at $10,900, or 1.0% of the $1,090,000 Purchase Price. Id. ¶ 25.

The Foster Individuals request that they be permitted to pay all Costs of Sale directly out of escrow upon the close of the sale without further order of the Court.

### v. Homestead Exemption.

The Foster Individuals have claimed a $175,000 homestead exemption in the Property as both of them are over the age of 65 years old (the "Homestead Exemption"). See Foster Decl. ¶ 26. Following the closing of the sale and the expiration of any rent-back period, they plan to temporarily reside with Stanley at his residence in La Quinta, California, until they purchase a smaller, more reasonably priced residence, using the funds from the Homestead Exemption as their down payment. See id. ¶¶ 26, 27.

The Foster Individuals request that from the sale proceeds remaining after the Liens, Commission, and Costs of Sale have been paid, they be permitted to deposit an amount not to exceed $175,000, on account of the Homestead Exemption, in a new, segregated bank account, with the understanding that they will use the deposited funds in connection with the purchase of a new residence within six months of the date of such deposit.

### E. Estimated Remaining Sale Proceeds.

After application of the Buyer Credit, payment of the Liens, Commission, and Costs of Sale, and deposit of the funds on account of the Homestead Exemption, the Foster Individuals estimate that the remaining sale proceeds available to the estate will be at least **$40,021.51**. See Foster Decl. ¶ 28. Such amount has been calculated as follows:

| Line Item | Amount |
| --- | --- |
| Purchase Price | $1,090,000.00 |
| LESS Buyer Credit | ($3,500.00) |
| LESS Mortgage Lien | ($803,308.49) |
| LESS Property Tax Liens | ($2,770.00) |
| LESS Commission | ($54,500.00) |
| LESS Costs of Sale | ($10,900.00) |
| LESS Homestead Exemption | ($175,000.00) |
| **Remaining Sale Proceeds** | **$40,021.51** |

See id. The remaining sale proceeds will provide the Foster Individuals with an adequate cash reserve that can be used in furtherance of their reorganization efforts.

### F. Estimated Tax Liability.

The Foster Individuals do not anticipate any substantial tax consequences for their estate in connection with the sale of the Property. Foster Decl. ¶ 29. Using an adjusted basis of $385,000 (based on the Foster Individuals' cost basis of that amount), a proposed sale price of $1,090,000, and estimated total costs of sale of $65,400 (6.0% of $1,090,000), the gain realized on the sale of the Property would be no greater than $639,600. Id. The taxable gain, however, would be no more than **$139,600** since the estate will be able to take advantage of the $500,000 principal-residence gain exclusion, available to married spouses filing jointly. Id. Using a 15.0% tax rate for long-term capital gains, the maximum potential tax liability from the sale of the Property would be **$20,940**. Id. However, the actual tax liability will be less as the costs of

improvements made to the Property over the past 20 years have not yet been included in the Foster Individuals' calculation of the adjusted basis of the Property. Id.

### 4. BASIS FOR RELIEF

**A.  The Foster Individuals Should Be Authorized to Sell the Property.**

By this Motion, the Foster Individuals first requests authorization to sell the Property to the Buyer in a private sale pursuant to § 363 of the Bankruptcy Code and authorization to apply the Buyer Credit, pay the Liens, Commission, Costs of Sale, and deposit the funds on account of the Homestead Exemption directly out of escrow upon the close of the sale without further order of the Court.

Section 363(b) authorizes a debtor in possession to sell property of the estate outside of the ordinary course of business only after notice and a hearing. See 11 U.S.C. §§ 363(b), 1107(a). A debtor in possession "who wish[es] to utilize § 363(b) to dispose of property of the estate must demonstrate that such disposition has a valid business justification" and "that the sale is proposed in good faith." 240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners, Ltd.), 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996).

Whether the proposed sale is supported by a valid business justification "depends on the case," in view of "all salient factors pertaining to the proceeding." Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988) (internal quotation marks omitted). Such factors may include

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

Id. at 20 (internal quotation marks omitted). And whether the sale is proposed in good faith "encompasses fair value, and further speaks to the integrity of the transaction." 240 N. Brand Partners, 200 B.R. at 659 (internal quotation marks omitted). Similarly, the court may also consider whether the sale "is fair and reasonable," whether "it has been given adequate marketing," whether "it has been negotiated and proposed in good faith," whether "the purchaser

1  is proceeding in good faith," and whether "it is an 'arms-length' transaction." In re Wilde Horse
2  Enters., Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).
3       Here, the Foster Individuals have a valid business justification for the proposed sale of
4  the Property, and such a sale has been proposed in good faith, which warrants the Court
5  authorizing the Foster Individuals to sell the Property to the Buyer for $1,090,000.

6       **i.   The Foster Individuals Have a Valid Business Justification for the Sale.**

7       Here, the circumstances of the chapter 11 case establish that the Foster Individuals have a
8  valid business justification for selling the Property.
9       Although their case was recently commenced, the Foster Individuals' proposed sale of
10  the Property is nevertheless appropriate as the sale will allow them to improve their cash
11  position, providing them with flexibility while in chapter 11. The Property, being their principal
12  residence, is not an income-producing property for the estate. See Foster Decl. ¶ 3. And it is
13  unlikely that they could turn the Property into a profitable rental property that would generate
14  rents exceeding their mortgage payments (which are currently $5,522.23 each month). See id.
15  ¶ 23. In other words, the estate does not lose out on any kind of revenue stream from the
16  disposition of the Property. More importantly, although the Foster Individuals, after selling the
17  Property, intend to purchase a new residence, which would similarly be a non-income-producing
18  property, the purchase of a smaller, more reasonably priced residence will have the effect of
19  reducing their living expenses. For instance, even if purchasing their new residence requires the
20  Foster Individuals to obtain, with the Court's approval, a new mortgage loan with monthly
21  payments of $3,000, such a potential scenario would still represent a $2,500 reduction in their
22  living expenses every month, thereby improving their cash position.
23       The Purchase Price of $1,090,000 is also likely to be the best price that the Foster
24  Individuals can get for the Property over at least the next few months and represents an amount
25  that is either equal to or slightly above the Property's fair market value. See Xu Decl. ¶ 17. In
26  fact, both brokers that the Foster Individuals interviewed at the beginning had indicated that the
27  Property could not be sold for more than $1,000,000, see Foster Decl. ¶ 7; Xu Decl. ¶ 4, and the
28  15 comparable properties reviewed by the Broker suggest that the Property is being sold at a

1 relative premium, see Xu Decl. ¶ 5. Additionally, after the Property is sold and all sale-related expenses are paid, not only will there be sufficient proceeds remaining for the estate to pay the tax liability from the sale but also there will also be proceeds for the Foster Individuals to use to further their reorganization efforts.

Under these circumstances, the Court should conclude that there is a valid business justification for the Foster Individuals to sell the Property to the Buyer for $1,090,000.

### ii. The Foster Individuals Have Proposed the Sale in Good Faith.

The Foster Individuals have also proposed the sale of the Property in good faith based on an analysis of the relevant factors.

The Property has been adequately marketed by the Broker as it has been continuously listed since June 27, 2017, on the CRMLS, which can be considered the most effective method for brokers to market California residential real property to the widest possible audience. See Xu Decl. ¶¶ 7, 16.

Next, as previously mentioned, the Purchase Price represents an amount that is either equal to or slightly above the Property's fair market value, see id. ¶ 17, which suggests that $1,090,000 is a fair and reasonable purchase price. And although the Foster Individuals wish to sell the Property in a private sale, the sale has still been proposed in good faith as courts have indicated that overbids or public auctions are not required with respect to every bankruptcy sale. See, e.g., In re Great Atl. & Pac. Tea Co., 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[A]sset sales are not conditioned on such a requirement [that they be subject to a formal auction], which does not appear in the Bankruptcy Code or Bankruptcy Rules."); see also Fed. R. Bankr. P. 6004(f) ("All sales not in the ordinary course of business may be by private sale or by public auction."). In this case, given that the Broker has not received any offers higher than the $1,090,000 offered by the Buyer over the past six weeks, see Xu Decl. ¶ 17, it is unlikely that opening up the sale to overbids will produce higher and better offers from other prospective buyers at this point. Furthermore, opening up the sale to overbids may require even more time for a sale to finally close, which means that the Buyer may walk away and the Foster Individuals will then have to entertain other—likely lower—offers on the Property.

Finally, both parties to the sale transaction are proceeding with the sale in good faith. The Foster Individuals do not know the Buyer and have no relations or connections to the Buyer. See Foster Decl. ¶ 30. The agreed-upon Purchase Price is the product of an arms-length negotiation between the Foster Individuals and the Buyer, in which the parties communicated their offers and counteroffers indirectly through the Broker. See id. ¶ 31. The Foster Individuals are unaware of any circumstances that would suggest the Buyer is not acting in good faith. Id.

For these reasons, the Court should conclude that the Foster Individuals have proposed to the sale of the Property in good faith.

**B.    The Court Should Authorize the Sale Free and Clear of All Liens and Interests.**

Under § 363(f) of the Bankruptcy Code, property of the estate to be sold under § 363(b) may be sold "free and clear of any interest in such property of an entity other than the estate, only if" one of the following five grounds for such relief is present:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5). An interest is in bona fide dispute under § 363(f)(4) when there is an objective basis for either a factual or legal dispute relating to such interest. See In re Dewey Ranch Hockey, LLC, 406 B.R. 30, 39 (Bankr. D. Ariz. 2009) (citing Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.), 277 F.3d 1057, 1064 (9th Cir. 2002)). Nevertheless, the court is not required "to determine the outcome of any dispute, only its presence or absence." In re Busick, 831 F.2d 745, 750 (7th Cir. 1987) (internal quotation marks omitted).

Here, the Foster Individuals argue that there is a bona fide dispute as to any potential tax lien held by the IRS purportedly against the Property, which justifies granting the sale of the

Property free and clear of all liens, claims, and interest held by the IRS.

Under federal law, "[i]f any person liable to pay any tax neglects . . . to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. Such a lien, however, is not valid against any bona fide purchaser unless and until a notice of federal tax lien has been filed in accordance with 26 U.S.C. § 6323(f). Id. § 6323(a).

Section 6323(f) then provides that the form and content of the notice shall be prescribed by the Secretary of the Treasury or his delegate (i.e., regulations promulgated by the IRS), with such notice being "valid notwithstanding any other provision of law regarding the form or content of a notice of lien." 26 U.S.C. § 6323(f)(3). The applicable IRS regulation, in turn, requires that the notice "<u>identify the taxpayer</u>, the tax liability giving rise to the lien, and the date the assessment arose." 26 C.F.R. § 301.6323(f)-1(d)(2) (emphasis added).

Further, for a tax lien to be perfected against real property, § 6323(f) provides that the notice must be filed "in one office within the State (or the county, or other governmental subdivision), as designated by the laws of such State, in which the property subject to the lien is situated." 26 U.S.C. § 6323(f)(1)(A)(i). Under California law, such a notice must "be filed for record in the office of the recorder of the county in which the real property subject to the liens is situated." Cal. Civ. Proc. Code § 2101(b). Additionally, if the property is situated in a state that invalidates a deed as against a bona fide purchaser unless such deed has been recorded, the notice "shall not be treated as meeting the filing requirements" for perfection as to a purchaser "unless the fact of filing [of such lien] is entered and recorded in [a public index at the place of filing] in such a manner that a reasonable inspection of the index will reveal the existence of the lien." 26 U.S.C. § 6323(f)(4)(B); accord <u>United States v. Buenting (In re Crystal Cascades Civil, LLC)</u>, 415 B.R. 403, 409 (B.A.P. 9th Cir. 2009) (affirming bankruptcy court's ruling that IRS's identification of taxpayer as "Crystal Cascades, LLC, a corporation" rather than the correct "Crystal Cascades Civil, LLC," resulted in the IRS's tax lien being outside the chain of title).

Here, a bona fide dispute exists with respect to any potential tax lien held by the IRS on account of taxes owed by Foster Enterprises asserted against the Property due to the lack of a

recorded Tax Lien Notice in Los Angeles County—where the Property is situated—that identifies Anna Foster as one of the taxpayers liable for those taxes. All that the Tax Lien Notices recorded in Los Angeles County provide is that the taxpayer is Foster Enterprises, without any other information that could lead an ordinary prudent person to have notice that a tax lien applied to Anna Foster's real property. Due to these facts, there is a bona fide dispute whether the IRS holds any tax lien against the Property, which provides the necessary basis for the Court to authorize the sale of the Property free and clear of all liens, claims, and interests held by the IRS.

## C.  Waiver of the 14-Day Stay under Rule 6004(h) Is Appropriate.

"An order authorizing the . . . sale . . . of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h) (emphasis added). Under this rule, "[t]he court may, in its discretion, order that [Rule 6004(h)] is not applicable so that the property may be . . . sold . . . immediately in accordance with the order entered by the court." Fed. R. Bankr. P. 6004 advisory committee note (1999).

Here, waiving the 14-day stay is appropriate as time is of the essence. Escrow is already set to close no later than August 11, 2017, see Foster Decl. ¶ 21, a date before the hearing on the Motion can be heard. While the Foster Individuals anticipate that the Buyer will agree to an extension of the closing date, see id., it is unknown how long of an extension the Buyer is willing to agree to. Nevertheless, it is unlikely that any agreed-upon extension will be far enough out to accommodate for the hearing on the Motion, the entry of the order granting the Motion, and a 14-day stay of such order. Accordingly, the Foster Individuals request that the Court waive the stay under Bankruptcy Rule 6004(h) to allow them to immediately close the sale.

## D.  The Foster Individuals Should Be Authorized to Employ and Pay the Broker.

By this Motion, the Foster Individuals also request authorization to employ the Broker as the real estate broker and pay the Broker the proposed Commission for the successful marketing and sale of the Property pursuant to §§ 327 and 328 of the Bankruptcy Code.

Under § 327, a debtor in possession, with the court's approval, may employ one or more professional persons, such as a real estate broker, so long as they "do not hold or represent an

1  interest adverse to the estate" and "are disinterested persons." 11 U.S.C. §§ 327(a), 1107(a).

2  Such a professional person may be employed, with the court's approval, "on any reasonable

3  terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or

4  percentage fee basis, or on a contingent fee basis." Id. § 328(a). However, § 328 provides that

5  > the court may deny allowance of compensation for services and reimbursement of
   > expenses of a professional person . . . if, at any time during such professional
6  > person's employment . . . such professional person is not a disinterested person, or
   > represents or holds an interest adverse to the interest of the estate with respect to
7  > the matter on which such professional person is employed.

8  Id. § 328(c).

9  An "interest adverse to the estate" includes "any economic interest that would tend to

10 lessen the value of the bankruptcy estate or that would create either an actual or potential dispute

11 in which the estate is a rival claimant" or "a predisposition under circumstances that render such

12 a bias against the estate." Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis),

13 347 B.R. 679, 688 (B.A.P. 9th Cir. 2006) (citing cases). And a "disinterested person" means a

14 person that (1) "is not a creditor, an equity security, or an insider;" (2) "is not and was not, within

15 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor,"

16 and (3) "does not have an interest materially adverse to the interest of the estate or of any class of

17 creditors or equity security holders, by reason of any direct or indirect relationship to, connection

18 with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(A)–(C). "The

19 ultimate decision as to whether there is a disqualifying conflict or adverse interest lies within the

20 discretion of the court." Mehdipour v. Marcus & Millichap (In re Mehdipour), 202 B.R. 474, 478

21 (B.A.P. 9th Cir. 1996), aff'd, 139 F.3d 1303 (9th Cir. 1998).

22     **i.**     **Services Rendered or to Be Rendered by the Broker.**

23 The services rendered and to be rendered by the Broker for the Foster Individuals and

24 their estate revolve around the marketing and sale of the Property and include the following:

25 (1) consulting the Foster Individuals on a listing price for the Property; (2) creating and

26 maintaining the Listing on the CRMLS; (3) communicating offers and counteroffers from

27 prospective buyers to the Foster Individuals, as well as counteroffers from the Foster Individuals

28 to the prospective buyers; and (4) arranging for the opening and closing of escrow in connection

with the sale of the Property. Xu Decl. ¶ 20.

### ii. The Broker's Disclosures Regarding Conflicts and Disinterestedness.

With respect to both the proposed employment of and compensation to the Broker, the Foster Individuals acknowledge that it may seem that the Broker represents an interest adverse to the estate and is not a disinterested person, but the Foster Individuals contend that the Broker qualifies to be employed and paid by the estate in the end.

The Broker discloses that since the Foster Individuals and the Broker entered into the Listing Agreement and the Broker was able to procure a ready, willing, and able buyer for the Foster Individuals prior to the commencement of the chapter 11 case, the Broker may be a creditor of the Foster Individuals who holds a contingent prepetition claim against the estate on account of a commission that it would be entitled to under the Listing Agreement if a sale of the Property is consummated. See Xu Decl. ¶ 25. However, the Broker has agreed to waive any and all prepetition claims that it may have against the estate. See id. Such a waiver will prevent the possibility of the Broker receiving a double recovery and render the Broker a disinterested person.

Additionally, the Broker discloses that since the Broker has acted as a dual agent in the sale of the Property, representing both the Foster Individuals and the Buyer, the concurrent representation of the Buyer may constitute the Broker representing an interest adverse to the Foster Individuals' estate. See id. ¶ 26. However, such a dual-agency role for a broker in real-property transactions is permissible under California law, see Cal. Civ. Code § 2079.17(b), with the broker still owing a fiduciary duty of utmost care, integrity, honesty, and loyalty to both the seller and the buyer in the same transaction, see id. § 2079.16, suggesting that there is no disqualifying conflict under applicable nonbankruptcy law that would disqualify the Broker from employment by the estate. Cf. Tevis, 347 B.R. at 688–94 (considering the California Rules of Professional Conduct to determine whether California attorneys were disinterested under § 327). In fact, since the Broker made the required disclosures to the Foster Individuals and the Buyer and obtained their consent, see Xu Decl. ¶ 9 & Ex. 1, the Broker would have been entitled to the commission in a nonbankruptcy context. See L. Byron Culver & Assocs. v. Jaoudi Indus. &

Trading Corp., 1 Cal. App. 4th 300, 304–05 (1991).

Furthermore, the Broker has not taken any actions on behalf of the Buyer that can be construed as lessening the value of the estate, creating a dispute with the estate, or showing a bias against the estate. Rather, the Broker's actions can be construed as benefitting the estate. In particular, the Broker was able to work with the Buyer after it rejected the Foster Individuals' counteroffer for $1,130,00, which led to the Buyer increasing its counteroffer from $1,050,000 to $1,090,000, see Xu Decl. ¶ 26, and the Broker has been able to keep the Buyer interested in closing the sale, despite the pendency of the chapter 11 case and the inevitable delay in the closing of escrow, see id.

For these reasons, the Court should conclude that the Broker does not hold or represent an interest adverse to the estate and is a disinterested person and authorize the Foster Individuals to employ the Broker and pay the $54,500 Commission to the Broker directly out of escrow upon the close of the sale without further order of the Court.[3]

### 5. CONCLUSION.

For the reasons and based upon the authorities cited above, the Foster Individuals hereby respectfully submit that good cause exists for the Court to grant the relief requested in the Motion.

Respectfully submitted,

Dated: August 11, 2017

ANGLIN, FLEWELLING, RASMUSSEN, CAMPBELL & TRYTTEN LLP

By:  /s/ Dean G. Rallis Jr.
       Dean G. Rallis Jr.

Proposed Attorneys for Howard and Anna Foster

---

[3] The Foster Individuals located one decision in which the bankruptcy court disallowed half of a commission due to a broker due to it acting as a dual agent for the debtors' estate and the buyer in a sale. See In re Acosta, Case No. 09-32339DM, 2011 Bankr. LEXIS 1939, at *8–9 (Bankr. N.D. Cal. May 25, 2011). However, such decision is distinguishable since the court in Acosta specifically indicated that the broker violated the court's employment order, which expressly provided that "Broker may not represent buyer in connection with the listing authorized by this order." Id. at *3, 7.